**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ALBERT GRIFFIN, )<br>)<br>   Plaintiff, )<br>)<br>v. )<br>)  JURY TRIAL DEMANDED<br>UNDERWRITERS LABORATORIES, INC., )<br>)<br>   Defendant. ) | |

## COMPLAINT

Plaintiff Albert Griffin, by and through his attorney, The Law Offices of Laurie J. Wasserman, in his complaint against Defendant, Underwriters Laboratories, Inc., states as follows:

**I. NATURE OF THE ACTION**

1. Plaintiff Albert Griffin ("Mr. Griffin") seeks to redress the legal and equitable wrongs he suffered when Defendant Underwriters Laboratories, Inc. ("Defendant" or "Underwriters") discriminated against him with respect to the terms and conditions of his employment based upon his race, in violation of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq.* ("Title VII"), and retaliated against him for opposing race discrimination, in violation of Title VII.

**II. PARTIES**

2. Mr. Griffin is an African American male and resides in this judicial district. He is retired Navy after having served for twenty years and attaining the rank of Senior Chief Machinist Mate.

3. Defendant Underwriters Laboratories, Inc. is a Delaware not-for-profit corporation doing business in the Northern District of Illinois, with its principal place of business at 333 Pfingsten Road, Northbrook, Illinois.

4. Defendant is a global independent safety science company with more than a century of expertise innovating safety solutions from the public adoption of electricity to new breakthroughs in sustainability, renewable energy and nanotechnology.

5. Defendant's mission is to conscientiously advance safety science through careful research and investigation, applying its efforts to prevent or reduce loss of life and property and to promote safe living and working environments for all people.

6. At all relevant times, Defendant was an "employer" within the meaning of Title VII, was a "person" within the meaning of Title VII, § 701(a), 42 U.S.C. § 2000e (a), and was a "covered entity" within the meaning of Title VII. Defendant employed more than 15 employees for each working day in more than 20 weeks during the previous year.

### III. JURISDICTION AND VENUE

7. All preconditions to jurisdiction under § 706 of Title VII, 42 U.S.C. § 2000e-5(f) (3) have been met.

    a. A Charge of Discrimination against Defendant based upon race discrimination, attached hereto as *Exhibit A*, was filed with the EEOC on or about August 25, 2008, within 300 days of the date of the last act of discrimination.

    b. The EEOC issued a Determination on September 25, 2012, in which it stated that it found reasonable cause to believe Defendant discriminated against Mr. Griffin in violation of Title VII, attached hereto as *Exhibit B*.

    c. Pursuant to 42 U.S.C. § 2000e-5(f)(1), Mr. Griffin received the Notice of Right to Sue from the EEOC on or about September 26, 2013, attached hereto as *Exhibit C*.

    d. Mr. Griffin filed this complaint within 90 days of receiving the Right to Sue from the EEOC.

8. Jurisdiction of this cause also arises under 28 U.S.C. § 1331, 1343 and 1367; 28 U.S. C. § 2000e-5(3) and principles of pendent and supplemental jurisdiction.

9. Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 29 U.S.C. § 1132(e) (2). The acts complained of and the events at issue all took place in this district.

IV. **FACTS**

10. After his twenty years of service in the Navy, Defendant hired Mr. Griffin in June 1992 as Assistant Maintenance Personnel.

11. On July 3, 2008, while conducting rounds in the Building 6 boiler room, Mr. Griffin found a hang-man's noose draped across a work cart behind the hot water boiler for which he is responsible.

12. He immediately notified Ethel Goatee ("Goatee"), Supervisor Shipping/Receiving and Mailroom, then Tom Buchanan ("Buchanan"), Section A Manager, who summoned Security.

13. Mike Zimmer ("Zimmer"), Supervisor Physical Security & Housekeeping, one of the Security employees who responded to the call, picked up the noose, and pulled and tugged on it stating more than once that he found nothing wrong with a noose in the workplace.

14. Shortly thereafter he met with Buchanan, Randy Damrow ("Damrow"), Department Manager, and Volker Kotscha ("Kotscha"), Facilities Director. During the meeting Buchanan, stated that maybe by handling the noose Zimmer was "checking to see if it works."

15. Thereafter Mr. Griffin met with Susan Leonhardt ("Leonhardt"), HR Specialist, to report the incident.

16. On July 16, 2008, Buchanan informed Mr. Griffin that that "they are never going to find out who did this because no one up there has the balls to ask the right questions."

17. On August 7, 2008, Damrow stated that "they are never going to find out who did this and I told them (HR) so to their faces." Buchanan, who was present at the time, concurred.

18. On August 11, 2008, Buchanan was transferred to another position in another building.

19. On August 25, 2008, Mr. Griffin filed the EEOC Charge attached hereto as *Exhibit A*.

20. On August 28, 2008, Damrow told Mr. Griffin that he (Damrow) was part of the investigative group (which Mr. Griffin had not been advised of) and stated that Zimmer said that it does not look like the rope was intended for Mr. Griffin.

21. On September 18, 2008, Mike Hartlaub ("Hartlaub"), Maintenance Technician, belittled Mr. Griffin for not having discovered and taken action concerning a water leak in a closet. Hartlaub then slammed the closet door shut, thereby endangering Mr. Griffin.

22. On September 19, 2008, there was a section meeting at which Chuck Gerhardt ("Gerhardt") ,Facilities Manager III, and Damrow threatened that there would be consequences if an employee makes a false allegation. This threat was clearly directed at Mr. Griffin.

23. On October 29, 2008, Hartlaub opened a door with such force that it almost seriously injured Mr. Griffin. Mr. Griffin believes that this was a deliberate act.

24. On November 3, 2008, Mr. Griffin was "stuck" with a vendor when Pat O'Donnell ("O'Donnell"), Maintenance Technician, did not attend a meeting with the vendor that had been scheduled. This fit in with the pattern established by O'Donnell of not communicating with Mr. Griffin unless absolutely essential in retaliation of Mr. Griffin having reported the noose incident.

25. On November 18, 2008, while working with electricians pulling communication cables, one of the electricians made comments about Mr. Griffin putting cables around Mr. Griffin's neck.

26. Several employees advised Mr. Griffin to be careful for his safety because Buchanan was carrying a lot of hate for Mr. Griffin.

27. Throughout this time frame, Damrow made numerous statements to Mr. Griffin and other employees to the effect that "Soon this (the investigation of the noose incident) will be all over and we will get back to business as usual."

28. On January 5, 2009, Mr. Griffin learned that, contrary to what he had been led to believe, Defendant had not informed the Northbrook Police Department of this hate crime.

29. Mr. Griffin then filed a report with the Northbrook Police Department concerning the noose.

30. On January 12, 2009, Mr. Griffin learned that Zimmer, the security officer who had acknowledged no problem with a hangman's noose being in the workplace, was promoted to be Manager of Security and Janitorial Personnel.

31. On January 23, 2009, during a conversation with Tina Ori ("Ori") in Human Resources, she advised Mr. Griffin that the security videotape that likely recorded an employee placing the noose in Mr. Griffin's work area was inexplicably missing.

32. On March 12, 2009, Mr. Griffin met with Ori and Robert Scott ("Scott"), Global HR Director, to discuss the status of the investigation of the noose during which Scott told Mr. Griffin that if he is so unhappy he "can walk out the door anytime and not come back."

33. On August 17, 2009, more than a year after the hangman's noose incident, having received no resolution to the incident, Mr. Griffin e-mailed the Defendant's president who confirmed that he did not know about the incident but would look into it immediately.

34. On August 28, 2009, Mr. Griffin received an e-mail from Irene Ho ("Ho"), in Human Resources, in response to his e-mail to the president.

35. Ms. Ho stated that the matter had been fully investigated and Defendant was unable to determine who was responsible.

36. September 16, 2009, Mr. Griffin was advised by co-workers to discontinue his pursuit of the hangman's noose incident.

37. On February 10, 2011, Mr. Griffin received his annual performance review which was the worst during his almost twenty years of working at Defendant.

## Count I – Race Discrimination in Violation of Title VII

38. Mr. Griffin realleges paragraphs 1 through 37 of this Complaint.

39. Defendant, by its actions and/or omissions as alleged, intentionally discriminated against Mr. Griffin in the terms and conditions of his employment, in violation of Title VII.

40. Defendant discriminated against Mr. Griffin with malice or reckless indifference to his federally protected rights.

41. As a proximate result of this discrimination, Mr. Griffin suffered pain and suffered other damages.

42. To deter future malice or reckless indifference to the federally protected rights of employees by Defendant and other employers, and to punish Defendant for its malice or reckless indifference to the federally protected rights of Mr. Griffin, the Court should award compensatory damages.

WHEREFORE, Plaintiff Albert Griffin prays for:

    a.    Compensatory damages for the harm he suffered as a result of Defendant's violations of Title VII;

    b.    A permanent injunction enjoining Defendant from engaging in the discriminatory practices complained of herein;

    c.    A permanent injunction requiring Defendant to adopt employment practices and policies in accord and conformity with the requirements of Title VII, 42 U.S.C. § 2000 *et seq.*; and

    d.    Reasonable attorneys' fees, expert witness fees, expenses and costs of this action and prior administrative actions.

## Count II -Retaliation for Opposing Race Discrimination in Violation of Title VII

43. Mr. Griffin realleges paragraphs 1 thru 42 of this Complaint.

44. Defendant, by its actions and/or omissions as alleged and in violation of Title VII, retaliated against Mr. Griffin for having reported the hangman's noose in the workplace and filing a charge of race discrimination with the EEOC.

45. As a proximate result of this retaliation, Mr. Griffin lost opportunities to advance, and suffered pain and suffered, and incurred other damages.

46. Defendant retaliated against Mr. Griffin with malice or reckless indifference to his federally protected rights.

47. To deter future malice or reckless indifference to the federally protected rights of employees by Defendant and other employers and to punish Defendant for its malice or reckless indifference to the federally protected rights of Mr. Griffin, punitive damages should be awarded.

WHEREFORE, Plaintiff Albert Griffin prays for:

    a.    Wages, employment benefits, and other compensation lost to him as a result of Defendant's violations of Title VII;

    b.    Compensatory damages for the harm he suffered as a result of Defendant's violations of Title VII;

    c.    Prejudgment interest at the prevailing rate from the date of the discriminatory act to the date of judgment on the award of wages, employment benefits and other compensation lost to him as a result of Defendant's violations of Title VII;

    d.    A permanent injunction enjoining Defendant from engaging in the discriminatory practices complained of herein;

    e.    Such other relief as this Court deems just and appropriate.

Dated: February 28, 2014

**JURY DEMAND**
Respectfully submitted,
Plaintiff demands a jury to hear and decide all issues of fact.

By: /s/ Laurie J. Wasserman
    Plaintiff's Attorney

Laurie J. Wasserman, 3124845
Law Offices of Laurie J. Wasserman
9933 Lawler Avenue, Suite 122
Skokie, Illinois 60077-3703
Telephone: (847) 674-7324
Facsimile: (847) 674-6684
ljw@webemploymentlaw.com